**Keith CRESSMAN, Plaintiff–Appellant,**

v.

**Michael C. THOMPSON, in his official capacity as Secretary of Safety and Security and as the Commissioner of Public Safety for the State of Oklahoma; Paula Allen, individually and in her official capacity as Licensing Services Hearing Officer for the Oklahoma Department of Public Safety; Thomas Kemp, Jr., in his official capacity as Chairman of the Oklahoma Tax Commission; Jerry Johnson, in his official capacity as Vice Chairman of the Oklahoma Tax Commission; Dawn Cash, in her official capacity as**

Secretary Member of the Oklahoma Tax Commission; Kerry Pettingill, in his official capacity as Chief of the Oklahoma Highway Patrol, Defendants–Appellees.

No. 14–6020.

United States Court of Appeals, Tenth Circuit.

Aug. 4, 2015.

Nathan W. Kellum, Center for Religious Expression, Memphis, TN, (Bryan H. Beauman, Sturgill, Turner, Barker & Moloney, PLLC, Lexington, KY, with him on the briefs), for Plaintiff–Appellant.

Kevin L. McClure, Assistant Attorney General, Office of the Attorney General, Oklahoma City, OK, (Larry Patton, Senior Assistant General Counsel, and Taylor P. Henderson, Assistant General Counsel, Oklahoma Tax Commission, Oklahoma City, OK, with him on the brief), for Defendants–Appellees.

Before HOLMES, BACHARACH, and McHUGH, Circuit Judges.

HOLMES, Circuit Judge.

In this case, we must decide whether Oklahoma's depiction of a Native American shooting an arrow towards the sky on its standard vehicle license plates compels Appellant Keith Cressman to speak in violation of his First Amendment rights.

In a prior appeal, we determined that Mr. Cressman had alleged sufficient injury to confer standing and that he had stated a plausible compelled-speech claim at the motion-to-dismiss stage. *See Cressman v. Thompson,* 719 F.3d 1139, 1147–56 (10th Cir.2013) (*"Cressman I"*). On remand, and after a bench trial, the district court concluded that a reasonable person would not understand the vehicle license plate image to convey the pantheistic message to which Mr. Cressman objects; it thus held that he was not compelled to speak. *See Cressman v. Thompson,* No. CIV–11–1290–HE, 2014 WL 131715, at *5 (W.D.Okla. Jan. 14, 2014). Exercising our

jurisdiction under 28 U.S.C. § 1291, we now **affirm**.

## I

## A

In 2007, the Oklahoma legislature created the Oklahoma License Plate Design Task Force to update the design of the standard Oklahoma vehicle license plate. *See* Okla. Stat. tit. 47, § 1113.3. This change was motivated by the public-safety concern that the old license plates were difficult to read. However, the task force also viewed the redesign as an opportunity to "market Oklahoma as a tourist destination." Aplt.App. at 171 (Okla. State Senate Press Release, dated Nov. 27, 2007). In 2008, the task force chose a design that included an image of a Native American man shooting an arrow towards the sky (the "Native American image").[1] It also featured the words "Native America." *Id.* at 174 (Okla. Tax Comm'n Website, dated Oct. 31, 2008).[2] The image is based on a sculpture by acclaimed Oklahoma artist Allan Houser, entitled *Sacred Rain Arrow*, which depicts the story of a young Apache warrior who fired an arrow that was blessed by a medicine man into the heav-

ens; as the tale goes, the arrow carried prayers for rain to the Spirit World.[3]

Mr. Cressman, an Oklahoma resident, professes "historic Christian beliefs," including monotheism and the view that "Jesus Christ is the mediator between all people and God." *Id.* at 91–92 (Trial Tr., dated Jan. 9, 2014). He learned about the new license plate design, the *Sacred Rain Arrow* sculpture, and the Native American legend that inspired Mr. Houser's work from various news stories covering the redesign. He objected to the Native American image because, in his view, it conveys "the same message as the [*Sacred Rain Arrow* ] statue," which he believes teaches that there are "multiple gods" and that "the arrow is an intermediary for prayer." *Id.* at 97.

Finding the license plate image to be irreconcilable with his beliefs, Mr. Cressman tried various means to avoid displaying it. He initially covered up the Native American image on the standard license plates affixed to his vehicles. However, he was advised by a tag agency that obscuring any part of the license plate might be illegal.[4] He subsequently visited the Oklahoma Tax Commission, where a clerk

---

1.  We have appended a picture of the Oklahoma license plate design at issue to the end of this opinion. *See* Appendix, *infra*.

2.  The motto "Native America" had also been displayed on the old license plates, and representatives from the Department of Tourism and Recreation recommended retaining the phrase "because of the ongoing success of promotional campaigns associating the State of Oklahoma and the phrase 'Native America.' " Aplt.App. at 172 (Progress Report of Okla. License Plate Design Task Force, dated Dec. 31, 2007).

3.  Allan Houser was an award-winning Chiricahua Apache sculptor whose work is displayed in numerous major art collections worldwide. *Sacred Rain Arrow* is one of Mr. Houser's more prominent sculptures. Castings of the statue have been displayed at the

2002 Winter Olympic Games, the meeting room of the U.S. Senate Select Committee on Indian Affairs, the Smithsonian's National Museum of the American Indian, and the Gilcrease Museum in Tulsa, Oklahoma.

4.  In Oklahoma, tag agents are private persons or entities that are self-employed independent contractors who are supervised by the State and charged with collecting and reporting to the State all motor vehicle taxes. *See* Okla. Stat. tit. 47, § 1140(B) (describing the appointment process for motor license agents and stating that "[a]ll motor license agents shall be self-employed independent contractors and shall be under the supervision of the [Oklahoma] Tax Commission"); *Marton v. State,* 809 P.2d 671, 675 (Okla.Crim.App. 1991) (stating, in an embezzlement case, that the evidence showed that "as a tag agent,

again informed him that he could not cover up the Native American image, but that he could instead obtain a specialty license plate for an extra charge. Mr. Cressman then spoke with a hearing officer at the Department of Public Safety, who confirmed that he could be prosecuted for covering up the license plate image. *See* Okla. Stat. tit. 47, § 1113.[5] Indeed, concealing a state-issued license plate is a misdemeanor under Oklahoma law. *See id.* § 1151(A)(2). During this time, Mr. Cressman obtained specialty plates for his vehicles, the cost of which ranged from eighteen to thirty-eight dollars more than a standard license plate.[6]

In March 2010, Mr. Cressman sent letters to the Attorney General of Oklahoma and various other state officials indicating that he no longer wished to pay the extra charge for the specialty plates and asking that he be allowed "either to cover up the image of the 'Sacred Rain Arrow' sculpture on a standard license plate or ... obtain a vanity plate free of charge." Aplt.App. at 169 (Letter, dated Mar. 10, 2010). He did not receive a response to these requests.

### B

Mr. Cressman filed the present 42 U.S.C. § 1983 civil-rights lawsuit in No-

vember 2011, alleging that he was forced to display the Native American image—and thereby communicate its allegedly pantheistic message—in violation of his free-speech, free-exercise, and due-process rights under the First and Fourteenth Amendments.[7] He sought an injunction prohibiting state officials from prosecuting him for covering the image on his license plate or, alternatively, an order requiring the Oklahoma Tax Commission to provide him with a specialty license plate at the same cost as a standard license plate. The defendants filed motions to dismiss based on a lack of standing and a failure to state a claim upon which relief could be granted. The district court found that Mr. Cressman had standing, but nonetheless dismissed the complaint because, in its view, Mr. Cressman had failed to state a plausible claim of compelled speech. *See Cressman v. Thompson,* 871 F.Supp.2d 1176, 1180–86 (W.D.Okla.2012).

On appeal, in *Cressman I,* we confirmed that Mr. Cressman did indeed meet the requirements for Article III standing. *See* 719 F.3d at 1144–47. However, we reversed and remanded to the district court for further proceedings based on our conclusion that Mr. Cressman's complaint

Appellant was an independent contractor of the State to collect and report all motor vehicle taxes"). Although they are not state officials, *see* Okla. Admin.Code § 710:60–9–114 ("Under no circumstances shall a Motor License Agent hold himself/herself out as an agent of the Oklahoma Tax Commission."), the Supreme Court of Oklahoma has recognized that tag agents hold "a position of substantial public impact, and ha[ve] duties which involve[ ] the collection and accounting for substantial amounts of public funds, as well as administering an area of the law which affect[s] practically every citizen...." *Hodges v. Okla. Journal Pub. Co.,* 617 P.2d 191, 194 (Okla.1980).

**5.** This provision of the Oklahoma Vehicle License and Registration Act states, in relevant part, that "[t]he operation of a vehicle in this state, regardless of where such vehicle is registered, upon which the license plate is covered, overlaid or otherwise screened with any material, whether such material be clear, translucent, tinted or opaque, shall be a violation of this paragraph." Okla. Stat. tit. 47, § 1113(A)(2).

**6.** The additional fee varies based on the type of specialty license plate. *See* Okla. Stat. tit. 47, §§ 1135.1–.6.

**7.** Mr. Cressman also asserted a violation of the Oklahoma Religious Freedom Act ("ORFA").

stated a plausible compelled-speech claim. We found that the complaint sufficiently alleged the elements of symbolic speech established in *Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (per curiam), and *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)—namely, that the Native American image "conveys a particularized message that others are likely to understand and to which [Mr. Cressman] objects." 719 F.3d at 1157. We further concluded that, under the Supreme Court's decision in *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), the placement of the image on Oklahoma's license plate meant that the message it conveyed was "sufficiently linked" to Mr. Cressman "to raise compelled speech concerns." 719 F.3d at 1157. Given the pleading stage of the litigation, we did not question Mr. Cressman's assertion that "others are in fact likely to perceive the message [he] alleges." *Id.* at 1154. Instead, we noted that "further factual development through discovery may or may not support this allegation." *Id.*[8]

After the case was remanded to the district court, the parties engaged in discovery and filed cross-motions for summary judgment and a joint stipulation of uncontested facts. The district court granted partial summary judgment to defendants Thomas Kemp, Jr., Jerry Johnson, and Dawn Cash (collectively, the "Tax Commission defendants"), concluding that it lacked subject-matter jurisdiction under the Tax Anti–Injunction Act to compel the Tax Commission to issue Mr. Cressman a specialty license plate at the same cost as a standard license plate.[9] It denied the other parties' summary-judgment motions and instead held a bench trial on Mr. Cressman's various claims.

The district court ultimately concluded that the Native American image, in isolation, did not provide a basis for Mr. Cressman's First Amendment claim because:

> a reasonable observer would not be likely to conclude that an identifiable message was conveyed simply from the inclusion of the image on the standard state license plate. Without further research, it is simply a depiction of an Indian shooting a bow and arrow. A reasonable observer, even one living in Oklahoma, would not be likely to know of All[a]n Houser's intentions or thoughts in creating the "Sacred Rain Arrow" statue or of the legend behind it, even if the observer assumed the image was an exact replica of the statue.

Aplt.App. at 227 (Order, filed Jan. 14, 2014) (footnote omitted). Instead, the court found that, in the context of the license plate as a whole, the meaning a reasonable observer would likely perceive from the image was something "akin to

---

8. Because we found that Mr. Cressman had alleged sufficient facts to establish a plausible symbolic-speech claim under the traditional *Spence–Johnson* analysis, we did not decide whether the Supreme Court's subsequent decision in *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), modified this inquiry. *See* 719 F.3d at 1153. We also did not reach the question of whether the image was pure speech that would automatically warrant First Amendment protection. *See id.*

9. The district court subsequently granted the Tax Commission defendants' motion for judgment on partial findings under Federal Rule of Civil Procedure 52(c) at the close of Mr. Cressman's evidence. The court determined that the Tax Commission had no role in the enforcement of Okla. Stat. tit. 47, § 1113, and, because it lacked subject-matter jurisdiction to order the Tax Commission to issue a specialty plate at the same cost, it concluded that the Tax Commission defendants were not proper defendants in the case.

... [the notion] that Oklahoma is Native America"—a message that Mr. Cressman explicitly indicated was not objectionable. *Id.* at 228. The court also dismissed the argument that the license plate image was pure speech.[10] As such, it concluded that Mr. Cressman was not compelled to speak in violation of his First Amendment rights, denied his motion for a preliminary injunction, and entered judgment in favor of the defendants.

## II

In a matter involving First Amendment rights, we review the district court's decision de novo, conducting "an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Citizens for Peace in Space v. City of Colo. Springs,* 477 F.3d 1212, 1219 (10th Cir.2007) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)); *accord Horstkoetter v. Dep't of Pub. Safety,* 159 F.3d 1265, 1270 (10th Cir.1998). The factual findings, as well as the conclusions of law, are reviewed "without deference to the trial court." *Citizens for Peace in Space,* 477 F.3d at 1219 (quoting *Hurley,* 515 U.S. at 567, 115 S.Ct. 2338).

Because we have previously considered and resolved certain questions in this case, we are bound by the findings of the previous panel in *Cressman I* regarding those issues under the law of the case doctrine. Under this doctrine, "the decision of the appellate court establishes the law of the case and ordinarily will be fol-

lowed by both the trial court on remand and the appellate court in any subsequent appeal." *Zinna v. Congrove,* 755 F.3d 1177, 1182 (10th Cir.2014) (quoting *Rohrbaugh v. Celotex Corp.,* 53 F.3d 1181, 1183 (10th Cir.1995)); *see Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah,* 114 F.3d 1513, 1520–21 (10th Cir.1997). We will only deviate from the law of the case "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice." *United States v. Irving,* 665 F.3d 1184, 1192 n. 12 (10th Cir.2011) (quoting *United States v. Alvarez,* 142 F.3d 1243, 1247 (10th Cir.1998)). Neither party alleges, nor does it appear to be true, that any of these narrow exceptions are applicable here. Thus, our conclusions in *Cressman I* will continue to govern in this case.

## III

As a preliminary matter, we briefly address the defendants' contention that we need not rule on the merits of Mr. Cressman's First Amendment claim at all. Specifically, they assert that Mr. Cressman lacks standing to assert his First Amendment challenge and that, in any event, the Native American image on the license plate is government speech excepted from First Amendment scrutiny.

By way of preface to our detailed analysis below, we note that our court has already rejected these arguments in *Cress-*

---

10. The court only summarily discussed its rationale for concluding that the image was not pure speech, stating that:

> The court disagrees with plaintiff's suggestion that an image like that displayed here is "pure speech." The Tenth Circuit's discussion of the circumstances in this case [in

> *Cressman I* ] does not suggest any such view and it is difficult to see how, as a categorical matter, depicting an image of something can be viewed as necessarily different from depicting some other sort of "symbol."

Aplt.App. at 223 n. 8 (emphasis omitted).

*man I*, and because we are governed by the law of the case, we dismiss them once again. Moreover, even if we were to consider these issues anew, we would provide the same answers: Mr. Cressman has met the requirements of Article III standing, and controlling Supreme Court precedent establishes that speech on a vehicle license plate triggers constitutionally significant compelled-speech concerns.

### A

■ The defendants argue that Mr. Cressman lacks Article III standing because he has not owned a vehicle with the standard Oklahoma license plate since 2009 and because he was never "threatened with a ticket or prosecuted for violating" the statutory prohibition on concealing license plates. Aplee Br. at 27. Therefore, the defendants claim that any alleged injury is merely speculative.

Addressing standing in *Cressman I*, we held that Mr. Cressman's "alleged injuries are sufficient to support the first element [i.e., the injury-in-fact element] of Article III standing." 719 F.3d at 1145. We noted that he faces three choices, each of which would impose a concrete injury. First, he could violate Oklahoma law by concealing the Native American image, yet he would face "a threat of prosecution and criminal penalties if he [were to do] so." *Id.* Second, he could display the image, but, accepting his well-pleaded complaint allegations as true, this would "constitute[ ] compelled speech and [would be] an injury in fact." *Id.* Finally, he could purchase a specialty license plate; however, "[t]he additional cost of the specialty li-

cense plates is a concrete, actual monetary injury." *Id.* The defendants do not point to any intervening changes in Mr. Cressman's circumstances that would undercut the substance of our standing analysis in *Cressman I*, and thus we remain bound by that decision.[11]

■ Even if we were not bound by the law of the case that *Cressman I* establishes, we would still conclude that the defendants' arguments are meritless. It is well-established that a plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). Instead, it is enough for him to demonstrate that he has been warned that he will be prosecuted if he continues in his desired behavior, or that he otherwise show that his "concern with arrest has not been 'chimerical.'" *Id.* (quoting *Poe v. Ullman*, 367 U.S. 497, 508, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961)). For example, we have previously held that a plaintiff has standing when his actions are made illegal "by the plain language of the statute." *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1193 (10th Cir.2000); *see also Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir.2012) ("[T]he existence of a statute implies the threat of its enforcement...."). Here, two different state officials—a clerk at the Oklahoma Tax Commission and a hearing officer at the Oklahoma Department of Public Safety—as well as a tag agent who, though an independent contractor, *see* Okla. Stat. tit. 47, § 1140(B), is supervised by the

---

11. The district court appropriately concluded that the law of the case governed when the defendants raised the issue of Mr. Cressman's standing on remand, questioning why they would make such an argument when it was contrary to "the Court of Appeals' determina-

tion," Aplt.App. at 57 n. 8 (Order, filed Dec. 31, 2013), and affirming that "the factual matters addressed in [the] defendants' [summary-judgment] motion do not appear to undercut the basis for the standing determination previously made," *id.* at 57.

State and responsible for "administering an area of the law which affect[s] practically every citizen," *Hodges,* 617 P.2d at 194, expressly informed Mr. Cressman that it was illegal (or likely so) to cover part of his license plate. Indeed, he was told "that there would even be criminal penalties" for such a violation and that the Oklahoma Highway Patrol was "writing tickets" to violators. Aplt.App. at 106–07. This confirmation, combined with the clear statutory prohibition in Okla. Stat. tit. 47, § 1113—that makes it illegal to conceal a state-issued license plate—represents a credible threat of prosecution.

The fact that Mr. Cressman does not currently possess a standard Oklahoma license plate containing the Native American image is of no consequence to his standing. He owned vehicles with standard plates at the time of the redesign and subsequently covered up the Native American image, thus exposing himself to the threat of prosecution. In addition, he still suffers an injury in fact because he is forced to buy a more expensive specialty plate rather than the standard plate. Requiring an additional fee or tax for a government service is the kind of "indirect discouragement" we have recognized as an injury in the First Amendment context. *Axson–Flynn v. Johnson,* 356 F.3d 1277, 1290 (10th Cir.2004) (citation omitted); *see id.* (finding that an injury, for standing purposes, may include "imprisonment, fines, injunctions or taxes" (quoting *Phelan v. Laramie Cty. Cmty. Coll. Bd. of Trs.,* 235 F.3d 1243, 1247 (10th Cir.2000))). In short, we have no reason to doubt that Mr. Cressman has standing to sue.

## B

The defendants also claim that "[t]he Native–American on Oklahoma's official standard license plate does not implicate the First Amendment free-speech clause because it is government speech ... exempt from free-speech analysis." Aplee. Br. at 47 (emphasis omitted). By way of helpful reference, the Supreme Court has recently offered insight regarding the content of the government-speech doctrine:

> When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says. That freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech. Thus, government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas. Instead, the Free Speech Clause helps produce informed opinions among members of the public, who are then able to influence the choices of a government that, through words and deeds, will reflect its electoral mandate.

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,* —— U.S. ——, 135 S.Ct. 2239, 2245–46, 192 L.Ed.2d 274 (2015) (citations omitted).

However, as we held in *Cressman I,* on these facts, the defendants' government-speech "argument misses the mark." 719 F.3d at 1157. Regardless of whether the Native American image is the government's message, private First Amendment rights can still be significantly implicated because state-issued standard license plates are "readily associated" with vehicle owners, *Wooley,* 430 U.S. at 717 n. 15, 97 S.Ct. 1428, and may force them to "use their private property as a 'mobile billboard' for the State's ideological message," *id.* at 715, 97 S.Ct. 1428; *see Cressman I,* 719 F.3d at 1157 ("[S]peech on a license plate is sufficiently linked to the driver of the automobile displaying the license plate to raise compelled speech concerns.").

Thus, because "Mr. Cressman is 'closely linked with the expression in a way that makes [him] appear to *endorse* the government's message,'" we concluded in *Cressman I* that his individual First Amendment rights were implicated. 719 F.3d at 1157 (alteration in original) (emphasis added) (quoting *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 565 n. 8, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005)). We are bound by this conclusion. And it fatally undercuts the defendants' government-speech argument.

Furthermore, even if we were to consider this argument afresh, we would not reach a different outcome. The defendants primarily rely on *Johanns v. Livestock Marketing Association*, which involved the use of taxes collected from beef producers to market beef and beef products through government advertisements. *See* 544 U.S. at 553, 125 S.Ct. 2055. However, the Court in *Johanns* affirmed *Wooley's* vitality as a "true 'compelled-speech' case[ ], in which an individual is obliged *personally* to express a message he disagrees with," and distinguished the beef-marketing scheme as a "government-compelled subsidy of the *government's own speech*." 544 U.S. at 557, 125 S.Ct. 2055 (emphases added). The Court explicitly acknowledged that "there might be a valid objection if 'those singled out to pay the tax are closely linked with the expression' in a way that makes them appear to endorse the government message." *Id.* at 565 n. 8, 125 S.Ct. 2055 (citation omitted); *see id.* at 568, 125 S.Ct. 2055 (Thomas, J., concurring) ("The government may not,

consistent with the First Amendment, associate individuals ... involuntarily with [government] speech by attributing an unwanted message to them....").

The Supreme Court's recent decision in *Walker* further reaffirms our view that the issue of whether a license plate is government speech is inapposite where, as here, the central question presented is whether an individual has been compelled to speak. In *Walker*, the Supreme Court held that Texas's specialty license plate[12] designs constituted government speech, such that the State could refuse to issue a plate proposed by the Sons of Confederate Veterans that featured the Confederate flag. However, in doing so, the Court dispelled any notion that designating speech as "government speech" eliminates private-speech concerns. It emphasized that its "determination that Texas's license plate designs are government speech does not mean that the designs do not also implicate the free speech rights of private persons," 135 S.Ct. at 2252, and noted that "the Free Speech Clause itself may constrain the government's speech if, for example, the government seeks to *compel private persons to convey the government's speech*," *id.* at 2246 (emphasis added). In other words, even though license plate designs may be government speech, drivers "convey the messages communicated through those designs," *id.* at 2252, and a State runs afoul of the First Amendment if it "compel[s] a party to express a view with which the private party disagrees," *id.* at 2253; *see also Ariz. Life Coal.*, 515 F.3d at 967 n. 6 (noting that regardless of

**12.** Under Texas's specialty license plate program, designs were submitted by individuals and organizations and were subject to approval by the Texas Department of Motor Vehicles Board. *See Walker*, 135 S.Ct. at 2244–45 (describing the various processes through which Texas issues specialty license plates). Because individuals voluntarily selected, and paid an annual fee for, the specialty license plates, compelled speech was not at issue in *Walker*. *See id.* at 2253; *see also Ariz. Life Coal., Inc. v. Stanton*, 515 F.3d 956, 964 (9th Cir.2008) ("Specialty license plate programs do not raise issues regarding 'compelled-speech'....").

whether the New Hampshire motto at issue in Wooley was government speech, "it still implicated private speech interests because private individuals were being compelled to spread th[e] message through the use of their vehicle" (emphasis omitted)).

In short, the government-speech and compelled-speech doctrines are concerned with different things: the former focuses on the government's interest in expressing its own views, while the latter "involve[s] the government putting particular messages in the mouths of private speakers." Note, *The Curious Relationship Between the Compelled Speech and Government Speech Doctrines*, 117 Harv. L.Rev. 2411, 2422 (2004). *Compare Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (noting that the government "is entitled to say what it wishes"), *with W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (holding that the government may not "compel [an individual] to utter what is not in his mind"). Thus, the defendants' argument that the Native American image is government speech "misses the mark," *Cressman I*, 719 F.3d at 1157, and does not serve to rebut Mr. Cressman's claim that he has been compelled to endorse the State's message in violation of his individual First Amendment rights.

## IV

Turning to the substance of Mr. Cressman's appeal, the sole issue before us is whether he has been unconstitutionally compelled to speak by Oklahoma's requirement that he either display the Native American image on his vehicle license plate or pay an extra fee for a specialty plate.[13] Under the compelled-speech doctrine—and, in particular, *Wooley v. Maynard*—the affixation of objectionable speech on a standard license plate implicates compelled-speech concerns if it forces a vehicle owner to "be an instrument for fostering public adherence to a[ ] ... point of view he finds unacceptable." 430 U.S. at 715, 97 S.Ct. 1428. As we recognized in *Cressman I*, this requires us to resolve two substantive questions. First, is the Native American image speech protected by the First Amendment? If so, does requiring Mr. Cressman to display it on his license plate provide the basis for a legally viable compelled-speech claim? *See Cressman I*, 719 F.3d at 1148.

As we explain below, at bottom, Mr. Cressman's claim fails because he cannot demonstrate that the Native American image is, in fact, speech to which he objects. At least in the context of its mass reproduction on Oklahoma's standard vehicle license plate, the Native American image is not an exercise of self-expression entitled to pure-speech protection. The image may constitute symbolic speech, but the only conceivable message a reasonable observer would glean from the license plate is one to which Mr. Cressman emphatically

---

**13.** Mr. Cressman does not challenge the district court's ruling regarding its jurisdiction under the Tax Anti–Injunction Act or the grant of the Oklahoma Tax Commission defendants' Rule 52(c) motion. These claims are therefore deemed abandoned and effectively waived. *See Wyoming v. Livingston*, 443 F.3d 1211, 1216 (10th Cir.2006) (noting that an issue not raised in an appellant's opening brief is waived). Mr. Cressman asserts that his free-exercise, due-process, and ORFA claims are subsumed under his compelled-speech claim, and he does not dispute the district court's conclusion that these claims are "not separate from or different than his compelled speech claim." Aplt.App. at 219. Thus, the success of these claims turns on our review of the compelled-speech issue.

does not object—namely, a message that communicates Oklahoma's Native American culture and heritage. As such, Mr. Cressman's compelled-speech claim fails.

### A

The First Amendment's safeguard against state action "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley*, 430 U.S. at 714, 97 S.Ct. 1428. Thus, the Supreme Court, starting with *Barnette*, has consistently "prohibit[ed] the government from telling people what they must say." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 61, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006). This constraint on state compulsion is not limited to ideological messages; compelled statements of fact are equally proscribed by the First Amendment. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797–98, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988); *accord Axson–Flynn*, 356 F.3d at 1284 n. 4. "In order to compel the exercise or suppression of speech, the government measure must punish, or threaten to punish, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'" *Axson–Flynn*, 356 F.3d at 1290 (quoting *Phelan*, 235 F.3d at 1247). In other words, in order to make out a valid compelled-speech claim, a party must establish (1) speech; (2) to which he objects; that is (3) compelled by some governmental action.

The Supreme Court's decision in *Wooley v. Maynard*, which dealt with compelled speech on standard license plates, is a logical starting point for our analysis. In that case, the petitioners objected to the inclusion of New Hampshire's motto— "Live Free or Die"—on the State's standard license plates because it was "repugnant to their moral, religious, and political beliefs" as Jehovah's Witnesses. 430 U.S. at 707, 97 S.Ct. 1428. They continued to display the license plate while covering up the motto, but after being cited for violating a state law that forbade covering any part of a license plate, they sued under a compelled-speech theory. *See id.* at 708–09, 97 S.Ct. 1428. The Supreme Court held that because a vehicle is "readily associated with its operator," *id.* at 717 n. 15, 97 S.Ct. 1428, and driving an automobile is "a virtual necessity for most Americans," the State had forced the petitioners to use their car as a "'mobile billboard' for the State's ideological message," *id.* at 715, 97 S.Ct. 1428. It concluded that pressing the petitioners into either "fostering public adherence to an ideological point of view [they found] unacceptable" or facing prosecution unconstitutionally compelled them to speak. *Id.*

Despite the similarities between *Wooley* and the facts of the present case, there is one critical distinction that Mr. Cressman must overcome. In *Wooley*, the objectionable content was printed words, which the Court had no trouble finding was speech. Here, in contrast, Mr. Cressman objects to an image—a Native American shooting an arrow into the sky. Before we can decide whether the State of Oklahoma has in fact compelled Mr. Cressman to speak, we must first determine whether the image is in fact speech and, if so, whether he objects to the message it conveys.

### B

Although the First Amendment's protections extend "beyond written or spoken words as mediums of expression," all speech is not treated equally. *Hurley*, 515 U.S. at 569, 115 S.Ct. 2338; *accord Cressman I*, 719 F.3d at 1148. While "pure speech" activities are rigorously protected regardless of meaning, symbolic speech or conduct must be "sufficiently imbued with

elements of communication," *Spence,* 418 U.S. at 409, 94 S.Ct. 2727, and is subject to a "relaxed constitutional standard," *Christensen v. Park City Mun. Corp.,* 554 F.3d 1271, 1277 (10th Cir.2009); *see also Johnson,* 491 U.S. at 406, 109 S.Ct. 2533 ("The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word.").

▆ Mr. Cressman seeks to bring the Native American image displayed on Oklahoma's standard license plate into the fold of pure speech by characterizing it as an "image of representational art." Aplt. Opening Br. at 22. As such, he claims, the image need not stand for something else; "[d]ue to the expressive qualities inherent [to] images," they should be accorded the same treatment as words. *Id.* at 23. However, all images are not inherently expressive for purposes of pure speech. Context matters. Here, the reproduction of the Native American image on many thousands of standard license plates is not an exercise of self-expression to which full First Amendment protection is accorded.

### 1

The concept of pure speech is fairly capacious. According to the Supreme Court, this expanding list includes: fiction, *see Hurley,* 515 U.S. at 569, 115 S.Ct. 2338; music without words, *see Ward v. Rock Against Racism,* 491 U.S. 781, 790–91, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); dance, *see Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 65–66, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); theater, *see Se. Promotions, Ltd. v. Conrad,* 420 U.S. 546, 557–58, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); movies, *see Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 502–03, 72 S.Ct. 777, 96 L.Ed. 1098 (1952); and "pictures, . . . paintings, drawings, and engravings," *Kaplan v. California,* 413 U.S. 115, 119, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973). Our sister circuits have added, *inter alia,* tattoos, *see Anderson v. City of Hermosa Beach,* 621 F.3d 1051, 1060 (9th Cir.2010); the sale of original artwork, *see White v. City of Sparks,* 500 F.3d 953, 955–56 (9th Cir.2007); *ETW Corp. v. Jireh Publ'g, Inc.,* 332 F.3d 915, 924–25 (6th Cir.2003); *Bery v. City of N.Y.,* 97 F.3d 689, 694–96 (2d Cir.1996); custom-painted clothing, *see Mastrovincenzo v. City of N.Y.,* 435 F.3d 78, 96 (2d Cir.2006); and stained-glass windows, *see Piarowski v. Ill. Cmty. Coll. Dist. 515,* 759 F.2d 625, 628 (7th Cir.1985), to the tally.

▆ The justification for protecting these various media is "simply . . . their expressive character, which falls within a spectrum of protected 'speech' extending outward from the core of overtly political declarations." *Nat'l Endowment for the Arts v. Finley,* 524 U.S. 569, 602–03, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998). Thus, Arnold Schöenberg's atonal compositions, Lewis Carroll's nonsense verse, and Jackson Pollock's abstract paintings-regardless of their meaning, or lack thereof-are "unquestionably shielded" as expressions of the creators' perceptions and ideas. *Hurley,* 515 U.S. at 569, 115 S.Ct. 2338; *see White,* 500 F.3d at 956 ("A painting may express a clear social position, as with Picasso's condemnation of the horrors of war in *Guernica,* or may express the artist's vision of movement and color, as with 'the unquestionably shielded painting of Jackson Pollock.' . . . *So long as it is an artist's self-expression, a painting will be protected under the First Amendment. . . .*" (emphasis added) (quoting *Hurley,* 515 U.S. at 569, 115 S.Ct. 2338)); *see also Piarowski,* 759 F.2d at 628 (concluding that the First Amendment protects "art for art's sake").

▆ Given the animating principle behind pure-speech protection—*viz.,* safe-

guarding self-expression—it is evident that all images are not categorically pure speech. Instead, courts, on a case-by-case basis, must determine whether the "disseminators of [an image] are genuinely and primarily engaged in ... self-expression." *Mastrovincenzo,* 435 F.3d at 91; *see Serra v. U.S. Gen. Servs. Admin.,* 847 F.2d 1045, 1048 (2d Cir.1988) (noting that "artwork, like other non-verbal forms of expression, *may under some circumstances* constitute speech for First Amendment purposes" (emphasis added)).

The context-driven nature of the inquiry helps to explain the lines courts have attempted to draw in applying pure-speech protection to images. For example, while an artist's sale of his own original work is pure speech, this protection may not necessarily extend to reproductions of others' artwork. *See White,* 500 F.3d at 956 n. 4 (expressly declining to decide "the protection accorded to paintings that are copies of another artist's work or paintings done in an art factory setting where the works are mass-produced by the artist or others"); *Mastrovincenzo,* 435 F.3d at 85 ("distinguishing among artwork with presumptively expressive content ..., merchandise with potentially expressive content ..., and merchandise with no expressive content" (citation omitted)). Indeed, even *Bery,* which contains perhaps the most expansive language suggesting that images are pure speech under the First Amendment, does not establish a categorical rule. There, the court acknowledged instead that in analyzing various forms of visual expression, "[c]ourts must determine what constitutes expression within the ambit of the First Amendment and what does not."

*Bery,* 97 F.3d at 696; *see also Mastrovincenzo,* 435 F.3d at 85 (noting that *Bery* "left open the 'difficult' question of when the sale of assertedly artistic items constitutes protected speech").[13]

In short, Judge Noonan, concurring in *Anderson,* aptly and succinctly summarizes the guiding principle for our approach to examining whether an image is pure speech—"Context is all." 621 F.3d at 1068 (Noonan, J., concurring).

**2**

■ At issue here is a mass-produced image based on Allan Houser's sculpture. As an initial matter, the fact that the image depicts another artist's work does not necessarily remove it from the realm of pure speech. The Supreme Court has recognized that the First Amendment does not require "a speaker to generate, as an original matter, each item featured in [a] communication." *Hurley,* 515 U.S. at 570, 115 S.Ct. 2338. For example, one could envision circumstances under which a pictorial rendition of the *Sacred Rain Arrow* sculpture could itself be an expressive act—perhaps if the creator depicted the sculpture in a stylized way or incorporated a replica into a larger collage in order to convey his perspective.

■ But it is the reproduction of the image on thousands of Oklahoma license plates that militates toward a different result here. That is because, in this context, the image no longer implicates concerns about self-expression. Bereft of the size, dimensions, spatial relations, and other features of the *Sacred Rain Arrow* sculpture, the depiction can hardly be said to convey Mr. Houser's perception of the "strength, dignity, beauty and spirituality

---

13. The *Bery* court recognized that this context-specific inquiry would "prove difficult at times," 97 F.3d at 696, and we have noted that "[f]ederal circuit courts have struggled to define the extent of First Amendment protection for visual artwork," *Cressman I,* 719 F.3d at 1153 n. 14.

of his people." Aplt.App. at 49 (Stipulations of Parties, filed Nov. 22, 2013). Nor is the replication of the image, and its placement on a vehicle license plate, an act of creativity on the part of legislators or other state officials. Instead, the image was included in order to "market Oklahoma as a tourist destination." *Id.* at 171. Thus deployed, it is not unlike the "playing cards with artistic designs on the back" or "T-shirts emblazoned with the stars and stripes" that the *Mastrovincenzo* court suggested would not be protected as pure speech, 435 F.3d at 94, or the "mass-produced" artwork whose status under the First Amendment the Ninth Circuit left open in *White,* 500 F.3d at 956 n. 4. *See also Mastrovincenzo,* 435 F.3d at 106 n. 1 (Sack, J., concurring in part and dissenting in part) ("[A] vendor's sale by the score of 'expressive merchandise,' such as cast-iron Statues of Liberty or 'I ♥ N.Y.' T-shirts ... may not warrant full First Amendment protection if their dissemination does not have a dominant expressive purpose.").

Mr. Cressman suggests that courts have treated widely-reproduced images as pure speech without regard to whether the reproduction is a creative act. However, the two cases he points to—*Center for Bio–Ethical Reform, Inc. v. City of Springboro,* 477 F.3d 807 (6th Cir.2007), and *R.J. Reynolds Tobacco Co. v. Food & Drug Administration,* 696 F.3d 1205 (D.C.Cir. 2012), *overruled on other grounds by Am. Meat Inst. v. U.S. Dep't of Agric.,* 760 F.3d 18 (D.C.Cir.2014)—do not support this assertion. In *Center for Bio–Ethical Reform,* the Sixth Circuit held that a pro-life organization's use of "colorful pictures depicting graphic images of first-term aborted fetuses," accompanied by the caption "Choice," was protected under the First Amendment. 477 F.3d at 813, 821–22 (citation omitted). Similarly, in *R.J. Reynolds Tobacco Co.,* the D.C. Circuit treated the FDA's proposed inclusion on cigarette packaging of images showing the adverse health consequences of smoking—which, notably, were to be displayed alongside textual smoking warnings—as an attempt to compel cigarette manufacturers to convey the government's anti-smoking message. *See* 696 F.3d at 1211–12.

Neither court provided any analysis of why the images *themselves* were speech. Instead, both courts dealt with the images in the context of the accompanying provocative text and thus assumed that the images were communicative. *Id.* at 1211 (analyzing the images as part of the anti-smoking label "incorporat[ing] the textual warnings, a corresponding graphic image, and the '1–800–QUIT–NOW' cessation hotline number"); *Ctr. for Bio–Ethical Reform,* 477 F.3d at 821 (treating the aborted fetus images as part of the organization's anti-abortion "signs"). Thus, these cases do not counsel that a mass-produced image *by itself* constitutes pure speech.

Ultimately, we cannot conclude that the "heavy machinery of the First Amendment is to be deployed in every case" involving images. *Kleinman v. City of San Marcos,* 597 F.3d 323, 327 (5th Cir.2010). Pure-speech treatment is only warranted for those images whose creation is itself an act of self-expression. The Native American image on Oklahoma's standard license plate does not satisfy this criterion.

## C

■ Even if an image is not protected as pure speech, it may nonetheless fall within the First Amendment's purview as symbolic speech. However, because of the danger that "an apparently limitless variety of conduct can be labeled 'speech,'" *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), a display will only constitute symbolic speech if it is "sufficiently imbued with

elements of communication," *Spence*, 418 U.S. at 409, 94 S.Ct. 2727.

### 1

The test to determine whether a display is sufficiently communicative to warrant First Amendment protection was originally articulated in two seminal free-speech cases, *Spence v. Washington* and *Texas v. Johnson*. In *Spence*, a student displayed a United States flag upside down with a peace symbol attached to both sides. *See* 418 U.S. at 406, 94 S.Ct. 2727. He was prosecuted under a state statute that, as pertinent here, proscribed the placement of any "mark, picture, design, [or] drawing" on an American flag. *Id.* at 407, 94 S.Ct. 2727 (citation omitted). The Supreme Court found that the student's display "was a pointed expression of anguish ... about the then-current domestic and foreign affairs of his government." *Id.* at 410, 94 S.Ct. 2727. Because the act evinced "[a]n intent to convey a particularized message ..., and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it," the Court concluded that the act was entitled to First Amendment protection. *Id.* at 410–11, 94 S.Ct. 2727.

In *Johnson*, a demonstrator was prosecuted under a Texas law after he burned the American flag outside the Republican National Convention. *See* 491 U.S. at 399, 109 S.Ct. 2533. "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," the Court stated, "we have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Id.* at 404, 109 S.Ct. 2533 (alterations in original) (quoting *Spence*, 418 U.S. at 410–11, 94 S.Ct. 2727).

The Court found both factors present because the "overtly political nature of th[e] conduct was both intentional and overwhelmingly apparent." *Id.* at 406, 109 S.Ct. 2533. Thus, in summarizing these cases, we stated in *Cressman I* that the so-called *Spence–Johnson* test requires both "(1) an intent to convey a particularized message, and (2) a great likelihood that the message would be understood by those who viewed the symbolic act or display." *Cressman I*, 719 F.3d at 1149.

Subsequently, the Supreme Court revisited this area of First Amendment jurisprudence. Specifically, six years after *Johnson*, the Court's decision in *Hurley* "suggested the *Spence–Johnson* factors are not necessarily prerequisites for First Amendment protection for symbolic speech." *Cressman I*, 719 F.3d at 1149. In *Hurley*, the Court considered whether a St. Patrick's Day parade was symbolic speech deserving of First Amendment protection, such that the State could not require its organizers to allow a group of gay, lesbian, and bisexual descendants of Irish immigrants to march in the parade. Examining its precedents, the Court concluded that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Hurley*, 515 U.S. at 569, 115 S.Ct. 2338 (citation omitted).

Our sister circuits have taken divergent approaches to reconciling *Hurley* with the requirements of the *Spence–Johnson* test. At one end of the spectrum, the Second Circuit has "interpreted *Hurley* to leave intact the Supreme Court's test for expressive conduct in *Texas v. Johnson*." *Church of Am. Knights of the Ku Klux*

*Klan v. Kerik,* 356 F.3d 197, 205 n. 6 (2d Cir.2004) (citation omitted). In contrast, the Third Circuit has found that *Hurley* "eliminated the 'particularized message' aspect of the *Spence-Johnson* test." *Tenafly Eruv Ass'n v. Borough of Tenafly,* 309 F.3d 144, 160 (3d Cir.2002). Other circuits fall somewhere in the middle. *See, e.g., Blau v. Fort Thomas Pub. Sch. Dist.,* 401 F.3d 381, 388 (6th Cir.2005) (stating that claimants must show that their conduct conveys a particularized message, but that the message need not be narrow or succinctly articulable); *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1270 (11th Cir.2004) (looking to whether "the reasonable person would interpret [a display] as *some* sort of message, not whether an observer would necessarily infer a *specific* message").

We have thus far refrained from articulating a precise post-*Hurley* symbolic-speech test and have "merely observe[d] that *Hurley* suggests that a *Spence–Johnson* 'particularized message' standard may *at times* be *too high a bar* for First Amendment protection." *Cressman I,* 719 F.3d at 1150 (emphases added). We need go no further than this general observation here because, as explained below, neither the particularized nor general message Mr. Cressman divines from the image is one that a reasonable observer would perceive.[14]

## 2

Mr. Cressman initially asserts that the message he objects to is "simple enough: [a] Native American crouched down and shooting an arrow into the clouds." Aplt. Opening Br. at 34. This is the meaning, he claims, that he does not wish to convey. However, his argument appears to stretch the word "message" beyond recognition. If, as Mr. Cressman asserts, a *description* of the display is sufficient to constitute a message, this would defeat the very purpose of symbolic-speech analysis—*viz.,* to determine whether a display has underlying *communicative* or *expressive* qualities.

We have previously concluded that *Hurley* is "consistent with *Spence* and *Johnson* in granting First Amendment protection for symbolic acts or displays that are sufficiently imbued with elements of communication." *Cressman I,* 719 F.3d at 1150–51. Thus, even assuming *arguendo* that *Hurley* has diminished the particularized-message requirement, it has not eroded the bedrock principle that symbolic speech must involve "the expression of an idea" in order to warrant constitutional consideration. *Spence,* 418 U.S. at 411, 94 S.Ct. 2727. For example, the Court in *Hurley* discussed at length the expressive purpose of a parade, noting that it is more than just a "group of people [who] march from here to there"—*viz.,* it not just the observable factual conduct of the parade's participants—but, rather, involves "marchers

---

14. Mr. Cressman points out an apparent inconsistency between the symbolic-speech and compelled-speech doctrines. Under *Spence, Johnson,* and even *Hurley,* there must be an "intent to convey" a message. *Johnson,* 491 U.S. at 404, 109 S.Ct. 2533 (citation omitted); *Spence,* 418 U.S. at 410–11, 94 S.Ct. 2727; *see also Hurley,* 515 U.S. at 568–69, 115 S.Ct. 2338 (discussing the expressive goal of parades). However, by definition, compelled speech requires that the speaker be forced to speak against his intentions. As such, Mr.

Cressman argues that we should refrain from applying the *Spence–Johnson* framework entirely. We need not take such an extreme position. In *Cressman I,* we resolved this tension by assuming that the compulsion aspect of a compelled-speech claim would "satisfy any intent requirement under *Spence* and *Johnson." Cressman I,* 719 F.3d at 1154 n. 15. We adopt this assumption here and focus our attention on the second part of the symbolic-speech analysis—the likelihood that a reasonable observer would perceive a certain message.

who are making some sort of collective point, not just to each other but to by-standers along the way." 515 U.S. at 568, 115 S.Ct. 2338. To define the Native American image's "message" as merely the component parts of the image would be akin to viewing a parade's "message" as people walking down a street, which clearly misses "the inherent expressiveness of marching to make a point." *Id.; cf. Little Sisters of the Poor Home for the Aged v. Burwell,* 794 F.3d 1151, 1204, 2015 WL 4232096, at *40 (10th Cir.) (" '[W]e have extended First Amendment protection only to conduct that is inherently expressive.' The fact that Plaintiffs must complete the Form or notification to [the U.S. Department of Health and Human Services] to opt out of coverage does not render the act inherently expressive." (citation omitted) (quoting *Forum for Acad. & Institutional Rights, Inc.,* 547 U.S. at 66, 126 S.Ct. 1297)), *petition for cert. filed,* No. 15–119 (July 27, 2015).

Our sister circuits' post-*Hurley* decisions likewise do not suggest that a display itself constitutes a message for symbolic-speech purposes. While it is difficult to draw a common standard from their differing approaches, at a minimum they require that the display be of such a character that a viewer could draw an identifiable inference from it. *See, e.g., Kaahumanu v. Hawaii,* 682 F.3d 789, 799 (9th Cir.2012) (finding that "[w]edding ceremonies convey important messages about the couple, their beliefs, and their relationship to each other"); *Holloman,* 370 F.3d at 1270 (requiring that the appellant's conduct demonstrate "*some* sort of message"); *cf. Tenafly Eruv. Ass'n,* 309 F.3d at 162 (finding no expressive conduct where the challenged display did not "demonstrate a belief or assert anything").

Thus, the *Spence–Johnson* test—even if modified by *Hurley*—would oblige Mr. Cressman to articulate some inference drawn from the image that a viewer would perceive. A description of the image is not a message—particularized or general—for symbolic-speech purposes.

### 3

Mr. Cressman next suggests that it is "[e]minently reasonable" for anyone viewing the Native American image to associate it specifically with the legend of the Apache warrior or more broadly with ritualistic prayer and pantheism. Aplt. Opening Br. at 36. This is so, he claims, because of various matters of "common knowledge." *Id.* at 35. First, he opines that the publicity surrounding the license plate redesign clearly linked the image to Houser's *Sacred Rain Arrow,* and he notes that many of the news articles described the Apache warrior legend on which the statue is based. Second, Mr. Cressman suggests that any Oklahoman viewing the sculpture would connect it with Houser, a famous Oklahoma artist, and *Sacred Rain Arrow,* one of his most famous works. Finally, he claims that the "image itself conveys th[e] idea" (that is, the story) of the Apache warrior legend and related pantheistic notions: *viz.,* the "Native American shoots the arrow from a kneeling position, recognized as a prayerful posture," ostensibly indicating that he is not pursuing a practical or utilitarian purpose—such as hunting or shooting targets for practice—but, instead, a religious or spiritual one. *Id.* at 36–37.

Though we conclude that the Native American image is in fact symbolic speech, this does not avail Mr. Cressman's compelled-speech claim. That is because the image's message is one Mr. Cressman has explicitly indicated is not objectionable to him—that is, a message conveying Oklahoma's Native American culture and heritage.

### a

The district court and the parties have invoked the Establishment Clause's "reasonable-observer test" as a guidepost for applying the symbolic-speech analysis. *See, e.g.,* Aplt.App. at 226 ("[T]he essential question is what a reasonable observer of the image on the license plate would understand from it."). In cases construing the Establishment Clause, courts have frequently employed the reasonable-observer test to discern "whether a 'reasonable observer,' aware of the history and context of the community in which the conduct occurs, would view the practice as communicating a message of government endorsement or disapproval" of religion. *Bauchman ex rel. Bauchman v. W. High Sch.,* 132 F.3d 542, 551–52 (10th Cir.1997); *accord Green v. Haskell Cty. Bd. of Comm'rs,* 568 F.3d 784, 799 (10th Cir. 2009). At least at first blush, the reasonable-observer test would appear to be congruent with symbolic-speech jurisprudence; in that area, courts have focused on whether a display communicates a message that is identifiable by reasonable persons. *See Johnson,* 491 U.S. at 409, 109 S.Ct. 2533 (assaying the perspective of the "reasonable onlooker"); *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 294, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (describing expressive conduct as that which, "in context, would reasonably be understood by the viewer to be communicative"); *Holloman,* 370 F.3d at 1270 (noting that the expressiveness of an appellant's conduct is determined from the viewpoint of a "reasonable person"); see also *Spence,* 418 U.S. at 410, 94 S.Ct. 2727 (looking to the perspective of "the great majority of citizens" viewing the display); *cf. Walker,* 135 S.Ct. at 2251 (considering "observers' reasonable interpretation of the messages conveyed by" specialty license plates).

■ As the contours of the Establishment Clause's reasonable-observer test have been sketched over the years, it has become clear that this reasonable observer is not the everyday casual gawker. *See, e.g., Weinbaum v. City of Las Cruces,* 541 F.3d 1017, 1031 n. 16 (10th Cir.2008) ("Undoubtedly, the 'objective observer' is presumed to know far more than most actual members of a given community."). For example, the knowledge of the Establishment Clause's "reasonable observer" is not "gleaned simply from viewing the challenged display," *O'Connor v. Washburn Univ.,* 416 F.3d 1216, 1228 (10th Cir.2005) (quoting *Wells v. City & Cty. of Denver,* 257 F.3d 1132, 1142–43 (10th Cir.2001)); the reasonable observer is also aware of "the nature and history of the ... community, the circumstances surrounding the [display's] placement ... [,][the] community's response ... [and the] motivation for seeking the erection of the [display]," *Green,* 568 F.3d at 800; *see generally Am. Atheists, Inc. v. Davenport,* 637 F.3d 1095, 1104 (10th Cir.2010) (Kelly, J., dissenting from denial of reh'g en banc) (collecting cases that discuss the breadth of the reasonable observer's knowledge).

■ Similarly, in the symbolic-speech context, the reasonable person focuses on "context [to] give meaning to [a] symbol" and is cognizant of the "then-current domestic and foreign affairs of his government," "issue[s] of intense public concern," the "environment" in which an expressive act occurs, and the reasons for the speaker's expression. *Spence,* 418 U.S. at 410, 94 S.Ct. 2727; *see also Walker,* 135 S.Ct. at 2251 (looking to the "historical context" of license plate designs); *Johnson,* 491 U.S. at 405, 109 S.Ct. 2533 (interpreting the appellant's flag-burning "as part ... of a political demonstration that coincided with the convening of the Republican Par-

ty and its renomination of Ronald Reagan for President").

We are not obliged to (nor do we) definitively determine here whether the extent of congruence between the Establishment Clause's reasonable-observer test and symbolic-speech jurisprudence makes that test the appropriate one to apply in every instance in symbolic-speech cases like this one. Given both parties' invocation of the test and its seeming compatibility with symbolic-speech caselaw, it is sufficient for us to conclude that, in resolving this case, guidance is appropriately and helpfully sought from judicial decisions applying the Establishment Clause's reasonable-observer test.[15]

**b**

■ Here, the reasonable observer— though not omniscient—would have a much broader awareness than the selective knowledge Mr. Cressman attributes to him. Certainly, he would scrutinize the details and symbolism of the Native American image, and he would be acquainted with the Houser sculpture and the Apache warrior legend that inspired it. However, he would also be cognizant of many other contextual factors. Most obviously, he would be aware that the image was placed on Oklahoma's standard-issue license plates by legislators who in no small measure had a secular tourism-promotion pur-

pose in mind; they viewed license plates as potential "billboards for [the] state." Aplt. App. at 171. A central feature of that tourism-promotion purpose relates to Oklahoma's Native American history and cultural heritage. And the reasonable observer would known about those key aspects of the State. *Cf. Weinbaum*, 541 F.3d at 1033 (discussing the reasonable observer's knowledge of the history of Las Cruces, New Mexico, including the fact that its name and seal derive "from its founding near the site of a make-shift cemetery"). In this regard, not only would he be aware of the news articles linking the Native American image to the Houser sculpture, but also those public documents explaining that the motive for selecting the image was to advance a promotional campaign to "rebrand" the State as "Native America." Aplt.App. at 171; *cf. Green*, 568 F.3d at 800–01 (noting the objective observer's familiarity with statements made by a member of a county board of commissioners regarding a Ten Commandments monument); *Weinbaum*, 541 F.3d at 1033 (considering an explanatory brochure describing the history of Las Cruces); *O'Connor*, 416 F.3d at 1220 (discussing a brochure that made clear that the challenged display was part of an art exhibit). Finally, he would know that the public, the Oklahoma Department of Tourism, and the Oklahoma Department of Public Safety had the opportunity to pro-

---

**15.** Although we have steadfastly adhered to the reasonable-observer test in the Establishment Clause context, we recognize that it has been subject to some criticism. *See, e.g., Cty. of Allegheny v. ACLU*, 492 U.S. 573, 668, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (Kennedy, J., concurring in part and dissenting in part) (describing the reasonable-observer test as a "most unwelcome[] addition" to the Establishment Clause jurisprudence), *abrogated on other grounds by Town of Greece v. Galloway*, —— U.S. ——, 134 S.Ct. 1811, 1821, 188 L.Ed.2d 835 (2014); *Am. Atheists, Inc.*, 637 F.3d at 1110 (Gorsuch, J., dissenting from

denial of reh'g en banc) (questioning the continuing vitality of the reasonable-observer test). We do not enter into this debate. Controlling precedent from our court continues to apply the reasonable-observer test in the Establishment Clause context, *see, e.g., Fields v. City of Tulsa*, 753 F.3d 1000, 1010 (10th Cir.), *cert. denied*, —— U.S. ——, 135 S.Ct. 714, 190 L.Ed.2d 440 (2014), and in light of the parties' agreement that it provides a useful analytical lens, we are not called on to definitively decide its validity generally or as applied to the instant symbolic-speech setting.

vide input on the various designs considered by the license plate task force.

Based on this wealth of background information—notably, the pertinent facts and history of the license plate redesign process—a reasonable observer viewing Oklahoma's standard license plate would not conclude that the Native American image communicates the Sacred Rain Arrow legend. Indeed, even if we were to assume that *Hurley* diminishes the particularized-message requirement of the standard *Spence–Johnson* test, a reasonable observer would not conclude that the image, chosen by a legislative task force, with input from the public and various government agencies, was meant to generally advance pantheism or ritualistic prayer.

That said, the image does convey one identifiable message to a reasonable observer—namely, that Oklahoma's history and culture has been strongly influenced by Native Americans. Indeed, this is the message that the task force wanted to convey by selecting this image. And because the image is sufficiently communicative in this regard, we conclude that it qualifies as symbolic speech.

## 4

The concurrence of our thoughtful and esteemed colleague suggests that we need not decide whether the Native American image is either pure or symbolic speech. Instead, it finds that the image is speech based on the Supreme Court's decision in *Walker*, which treated license plates as government speech. After determining that we are dealing with speech—and deeming it "government speech," Concurrence at 966—the concurrence then purports to apply "traditional" compelled-speech principles, *id.* at 966, and concludes that Mr. Cressman has not been compelled to speak because no "third parties would interpret the graphic as a message pro-

moting pantheism, the message with which he disagrees," *id.* at 968. However, we are not persuaded that we can so deftly sidestep the question of whether the Native American image is pure speech or symbolic speech.

To begin, labeling speech as "government speech" only identifies the proponent of the message; it does not describe the type of speech at issue. The Supreme Court has recognized a clear distinction between symbolic speech and pure speech, *see Johnson*, 491 U.S. at 406, 109 S.Ct. 2533, and, just like individuals, the government can speak directly or through symbolic conduct. *Compare Wooley*, 430 U.S. at 715, 97 S.Ct. 1428 (involving the dissemination of the "State's ideological message" through the written slogan "Live Free or Die" on standard license plates), *with Walker*, 135 S.Ct. at 2251 (concluding that Texas's approval of various graphics for specialty license plates was government "expressive conduct").

In this regard, to the extent that the concurrence relies on *Walker*, it is significant that the Supreme Court found the approval of specialty license plate graphics not just to be "government speech," but also to be "expressive conduct," 135 S.Ct. at 2251—a term which the Court has used synonymously with "symbolic speech," *see Cressman I*, 719 F.3d at 1151 n. 13 (recognizing that "the Court has considered the expression in [*Spence, Johnson,* and *Hurley* ] to be 'symbolic speech' and 'expressive conduct'" (citation omitted)). Saliently, the *Walker* Court appeared to apply the symbolic-speech "reasonable onlooker" test of *Johnson*, 491 U.S. at 409, 109 S.Ct. 2533, by looking to, *inter alia,* the "historical context" and the "observers' reasonable interpretation of the messages conveyed by" the specialty license plates, *Walker*, 135 S.Ct. at 2251; *cf. Clark*, 468 U.S. at 294, 104 S.Ct. 3065 (analyzing whether the

conduct at issue "would reasonably be understood by the viewer to be communicative"); *Spence,* 418 U.S. at 410, 94 S.Ct. 2727 (recognizing that "the context in which a symbol is used for purposes of expression is important"). The concurrence does not suggest why we should ignore this aspect of *Walker;* indeed, the *Walker* Court's conclusion that Texas engaged in expressive conduct by approving specialty license plate graphics strongly counsels that Oklahoma's standard license plate image is also symbolic speech. *Cf.* Concurrence at 966 (stating that because Texas's specialty plates are government speech, "it follows that the graphic and slogan on the standard plate adopted by Oklahoma ... also constitute government speech").

In any event, we recognized in *Cressman I* that the question of whether the speech conveys the government's message (i.e., constitutes government speech) "misses the mark," 719 F.3d at 1157, because government speech, if foisted upon an unwilling private party, still implicates compelled—speech concerns. As the concurrence acknowledges, *see* Concurrence at 967–68, *Walker* has reaffirmed this principle: "the First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party disagrees," 135 S.Ct. at 2253.

▮ Notably, the question that the concurrence elides—whether the speech at issue is pure or symbolic—arguably does matter to the compelled-speech inquiry. While it is certainly true that an individual is protected from being compelled to speak, irrespective of whether the speech being compelled is pure speech or symbolic speech, it is also clear that the burden a compelled-speech plaintiff bears in an allegedly symbolic-speech case differs from the burden such a plaintiff bears in an allegedly pure-speech case. Specifically, a court will only find symbolic speech where a plaintiff can identify a message that a reasonable onlooker would perceive. *See Johnson,* 491 U.S. at 404, 109 S.Ct. 2533; *Spence,* 418 U.S. at 410–11, 94 S.Ct. 2727. In contrast, with respect to pure speech, it is not clear to us, and it is at least open to question, whether a plaintiff must identify any message at all-let alone one that a reasonable observer would discern. *See, e.g., Anderson,* 621 F.3d at 1059 (concluding that pure speech is "entitled to full First Amendment protection without any need to resort to *Spence's* 'sufficiently imbued' test"); *Littlefield v. Forney Indep. Sch. Dist.,* 268 F.3d 275, 296 (5th Cir.2001) (Barksdale, J., concurring) ("[W]here speech is *pure,* a particularized message has never been required ...."); *see also White,* 500 F.3d at 956 (finding that art is protected under the First Amendment, regardless of any specific message it conveys, because "it is an artist's self-expression").

▮ More specifically, like the concurrence, we believe that to state a proper compelled-speech claim, a plaintiff must object to a message conveyed by the speech he is required to utter. *See Walker,* 135 S.Ct. at 2253 (noting that the State may not "compel a private party to express a view with which the private party *disagrees* " (emphasis added)). But, as we see it, if the speech is symbolic, then the only legally cognizable objectionable message is one that a reasonable observer would identify; if the plaintiff does not object to this reasonably discernible message, his compelled-speech claim fails. However, because the First Amendment protection accorded to pure speech is not tethered to whether it conveys any particular message—i.e., the speech at issue could mean different things to different people—it is not clear at all that the mes-

sage to which the plaintiff objects needs to be one a reasonable observer would perceive. For example, in *Wooley*, the Court appeared to accept the appellees' objection that the words "Live Free or Die" conveyed the ideological view that life is less precious than freedom without determining whether a reasonable onlooker, considering the phrase in the context of a state license plate, would perceive that meaning. 430 U.S. at 707 n. 2, 97 S.Ct. 1428; *see id.* at 720–21, 97 S.Ct. 1428 (Rehnquist, J., dissenting) (noting that the majority's decision "begs the question ... whether appellees, in displaying ... state license tags, the format of which is known to all as having been prescribed by the State, would be considered to be advocating political or ideological views").

The concurrence fails to grapple with the foregoing important matters. Indeed, the concurrence's analysis illustrates the flaw in its suggestion that we need not identify the kind of speech at issue in this case. Far from applying "standard" compelled-speech principles, Concurrence at 967–68, the concurrence in effect conducts a symbolic-speech analysis in the compelled-speech context. It concludes that Mr. Cressman has not been compelled to speak because "third parties would [not] interpret the graphic as a message promoting pantheism, the message with which he disagrees." *Id.* at 968. By invoking the perspective of "third parties," *id.*, the concurrence appears to apply a version of the reasonable-observer test,

which is a commonplace feature of symbolic-speech analysis. Indeed, the cases the concurrence cites for support, *see id.*, look to third parties' interpretation of a symbol in order to determine whether any allegedly objectionable matter that is ostensibly being compelled may properly be classified as speech. *See, e.g., Cressman I*, 719 F.3d at 1154 (discussing whether third-party viewers would understand the Native American image as conveying a pantheistic message, in relation to the conclusion that Mr. Cressman's complaint satisfied the *Spence–Johnson* symbolic-speech test); *Troster v. Pa. State Dep't of Corr.*, 65 F.3d 1086, 1092 (3d Cir.1995) (holding that an American flag patch on a uniform would not be viewed as "communicative or expressive" by "anyone (other than [the appellant] )" in order to resolve the appellant's "expressive conduct claim," and concluding that the appellant could not succeed on the merits "with respect to his compelled expression claim, for he ha[d] not made the necessary *threshold showing* that he was ... coerced to engage in expressive conduct" (emphasis added)). The concurrence thus does not present any authority to indicate that the interpretation of a third party would matter in the compelled-speech context if we were dealing with pure speech.

Ultimately, because it is arguably unclear whether the compelled-speech analysis would proceed in the same manner regardless of whether the Native American image [16] is pure or symbolic speech, we

---

**16.** The concurrence takes the position that we should look at the license plate as a whole, rather than focusing on the Native American image. *See* Concurrence at 966 n. 2. However, "we rely on the parties to frame the issues," *Greenlaw v. United States*, 554 U.S. 237, 243, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008), and throughout this litigation Mr. Cressman has made the deliberate choice to challenge the image of Houser's Sacred Rain

Arrow sculpture, not the other aspects of the license plate. *See* Concurrence at 966 n. 2 (noting that Mr. Cressman "raises no objection to the slogan[ ] 'Native America' "). Moreover, we cannot ignore our framing of the issue in *Cressman I*, where we identified the relevant question as whether "the *license plate image* constitute[s] symbolic speech," 719 F.3d at 1148 (emphasis added), and confined our analysis to the image, *see, e.g., id.* at

decline to accept the concurrence's suggestion that we sidestep this taxonomical question; instead, we explicitly determine that the Native American image is symbolic speech.

## D

Having determined that the Native American image is sufficiently expressive to qualify as symbolic speech, we now turn to determining whether, in relation to this speech, Mr. Cressman has established that the State has compelled him to adhere to a "view he finds unacceptable." *Wooley*, 430 U.S. at 715, 97 S.Ct. 1428. Throughout this litigation, the only reason Mr. Cressman has offered for objecting to the Native American image is what he views as its links to pantheistic Native American folklore. However, a reasonable person would not derive this meaning from the image. Instead, in light of the relevant facts and history of the license plate redesign process, those viewing the image would likely connect the image to Oklahoma's Native American history and culture. Yet, Mr. Cressman has repeatedly stated, both before this court and the district court, that he does not object to this message. His lack of objection to the only message that a reasonable observer would discern from the image is fatal to his compelled-speech claim; he has *not* been compelled to express a view he otherwise would not.

Mr. Cressman alternatively suggests that he can object to the Native American image just because it is speech required by the government—arguing that

"[b]y requiring a disinclined person to speak *any message*, the government is treating that person like a puppet." Aplt. Opening Br. at 49 (emphasis added). However, merely objecting to the fact that the government has required speech is not enough; instead, a party must allege some disagreement with the viewpoint conveyed by this speech. *See Walker*, 135 S.Ct. at 2253 ("[T]he First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party *disagrees*." (emphasis added)); *Little Sisters of the Poor*, 794 F.3d at 1203, 2015 WL 4232096, at *38 (rejecting a compelled-speech claim, *inter alia*, because "the regulations do not require an organization seeking an accommodation to engage in speech it finds objectionable or would not otherwise express"); *see also Hurley*, 515 U.S. at 562, 115 S.Ct. 2338 (parade organizers' objection to the inclusion of an LGBT group was based on the parade's "traditional religious and social values" (citation omitted)); *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 14, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (appellant was forced to express the messages of "those who disagree with [its] views and who are hostile to [its] interests"); *Wooley*, 430 U.S. at 707 n. 2, 97 S.Ct. 1428 (petitioners objected to the state motto, "Live Free or Die," on the grounds that it was inconsistent with their views as Jehovah's Witnesses); *Axson-Flynn*, 356 F.3d at 1281 (appellant stated that the use of certain expletives offended her religious beliefs).

1153 (asking whether Mr. Cressman had plausibly alleged that "the image ... is symbolic"); *id.* at 1156 (concluding that he had "plausibly alleged that he is compelled to speak because the image conveys a religious/ideological message"). Nevertheless, we recognize that the image does not stand alone, but rather is one component of the

license plate. Our analysis of whether the image communicates a message (i.e., qualifies as symbolic speech)—and, if it does communicate a message, the nature of that message—expressly takes into account the other elements of the license plate. *See supra* Part IV.C.3.b.

This disagreement, of course, need not be ideological, *see Axson–Flynn*, 356 F.3d at 1284 n. 4, and, indeed, could be relatively "minor," *see, e.g., United States v. United Foods, Inc.*, 533 U.S. 405, 411, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001) (involving a "minor debate[ ]" where an agricultural company that wanted to advertise "its brand of mushrooms [as] superior to those grown by other producers" was forced to pay for the message that "mushrooms are worth consuming whether or not they are branded"). However, given that the First Amendment reflects "a profound commitment to protecting communication of *ideas*," *Kaplan*, 413 U.S. at 119, 93 S.Ct. 2680 (emphasis added), the focus of compelled-speech analysis is ultimately not the fact that the required action is speech, but, rather, that the particular ideas expressed through such speech "alter [the speaker's] own message," *Pac. Gas & Elec. Co.*, 475 U.S. at 16, 106 S.Ct. 903—and thereby harm the speaker's sacrosanct "sphere of intellect and spirit," *Barnette*, 319 U.S. at 642, 63 S.Ct. 1178.

Because Mr. Cressman must identify some message that he finds objectionable, and because he in fact does not object to the only message reasonably conveyed by the Native American image, we hold that he has not been compelled to speak in violation of his First Amendment rights.[17]

V

For the foregoing reasons, we **AFFIRM** the district court's judgment in favor of the defendants.

***APPENDIX***

Oklahoma License Plate Design (size reduced to fit page). Aplt. App. at 164

McHUGH, Circuit Judge, concurring:

I concur in many respects with the majority's thoughtful and nuanced discussion of a difficult topic. But because I do not agree the resolution of this case turns on whether the license plate at issue consti-

---

17. Because we resolve Mr. Cressman's compelled-speech claim on the basis that he does not object to the message conveyed by the Native American image, we need not decide whether the operation of Okla. Stat. tit. 47, § 1113, and the cost of specialty license plates combined to coerce him into displaying the image.

tutes pure or symbolic speech, I write separately.

The majority first decides the graphic image of a kneeling Native American on the Oklahoma standard license plate is "not an exercise of self-expression entitled to pure-speech protection." Maj. Op. at ·950. It next considers whether the graphic is entitled to protection under the Supreme Court's symbolic speech jurisprudence and concludes it is "sufficiently communicative" to qualify as symbolic speech. *Id.* at 960. It then holds that, because Mr. Cressman does not object to the only identifiable message a reasonable observer would glean from the graphic and because he is required, at least in the symbolic speech context, to identify some message he finds objectionable, his compelled speech claim fails. *Id.* at 963–64. Thus, the majority concludes that "symbolic speech" can be compelled more readily under the First Amendment than "pure speech." I do not agree.

In my opinion, the analytical framework adopted by the majority and in our prior decision in this matter, *Cressman v. Thompson,* 719 F.3d 1139 (10th Cir.2013) (*Cressman I* ), has been supplanted by the United States Supreme Court's decision in *Walker v. Texas Div., Sons of Confederate Veterans, Inc.,* ·—— U.S. ——, 135 S.Ct. 2239, 192 L.Ed.2d 274 (2015). In *Cressman I,* the first unresolved issue was whether the case involved speech at all. As I read *Walker,* there is no longer any question that Oklahoma was engaged in government speech when it selected the slogan and graphic depicted on its standard license plate. And because the license plate, as a whole, is government speech designed to deliver a message from the State of Oklahoma,[1] I see no reason to begin our analysis by assessing whether the graphic alone constitutes speech, or whether that speech is symbolic or pure. Everyone, even Mr. Cressman, agrees Oklahoma selected a standard plate design that was intended to convey a message promoting the state. Aplt.App. at 122, 171; Aplt. Reply Br. at 9 n. 6; Maj. Op. at 959–60. Thus, it is speech. In my view, once it is determined the license plate is speech, the restrictions on the Oklahoma government's right to compel a private individual to carry its message apply equally, irrespective of whether the individual is compelled to speak through words, actions, symbols, or gestures.

My conclusion that the Oklahoma license plate at issue here is speech is based on the Supreme Court's recent decision in *Walker.* · There, the Court considered whether the Texas Department of ·Motor Vehicles Board's (the Board) rejection of a specialty license plate requested by the Sons of Confederate Veterans (SCV) violated the First Amendment. SCV argued that because the Board's rejection of the proposed plate design was based on the depiction of a Confederate flag, it constituted impermissible viewpoint discrimination. *See Walker,* 135 S.Ct. at 2245. The Supreme Court disagreed. It held that although the slogans and graphics contained on Texas specialty plates were first proposed by private parties, the State of Texas, acting through the Board, con-

---

1. The district court reached a similar conclusion when it considered the license plate as a whole. *See Cressman v. Thompson,* No. CIV–11–1290–HE, 2014 WL 131715, at *5 (W.D.Okla. Jan. 14, 2014) ("Of course, the Oklahoma standard license plate, taken as a whole and not focusing purely on the disputed image, does convey some message. The plate also prominently includes the word 'OKLAHOMA' and the words 'NATIVE AMERICA[.'] A reasonable observer would likely assume something akin to what the evidence suggests Oklahoma was trying to convey—that Oklahoma is Native America, or some formulation similar to that.").

trolled the messages that could be expressed, took ownership of any approved specialty design, and identified the slogans and graphics as its own by affixing the state's name to the approved plate designs. *Id.* at 2250–51. Based on these facts, the Supreme Court concluded that specialty plates constitute government speech by the State of Texas because the plates " 'are meant to convey and have the effect of conveying a government message.' " *Id.* at 2251 (quoting *Pleasant Grove City v. Summum,* 555 U.S. 460, 472, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009)). Consequently, the Court held that SCV could not force the State of Texas to adopt as the state's message the specialty plate design proposed by SCV. The Court further held that Texas's decision not to adopt SCV's message as the state's message did not implicate the First Amendment. *See id.* at 2253.

Where the Supreme Court has concluded the graphics and slogans contained on specialty plates proposed by private individuals—but approved and adopted by the State of Texas—constitute government speech, it follows that the graphic and slogan on the standard plate adopted by Oklahoma to convey a message promoting the state also constitute government speech. And I agree with the majority's thoughtful conclusion that the message conveyed by the standard plate is the promotion of Oklahoma's Native American heritage.[2] Accordingly, I would hold that the Oklahoma license plate is speech, albeit government speech.

Having determined the license plate is speech, I would conclude that this case turns not on whether Mr. Cressman objects to the image, as opposed to the words, depicted on the license plate, but rather on the application of traditional First Amendment principles governing compelled speech. *See Texas v. Johnson,* 491 U.S. 397, 416, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (indicating that the distinction between pure speech and expressive conduct "is of no moment where the nonverbal conduct is expressive" and where the government action is related to that expression); 1 Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* § 11:19 (2015) ("The key to understanding First Amendment cases involving symbolic speech or expressive conduct is that such cases are not different in kind from other First Amendment cases. The same basic analytical structure applies to such cases as to most other First Amendment conflicts."). That is, once a particular activity is deemed sufficiently expressive to trigger the First Amendment, courts apply the same First Amendment analysis to determine whether the government may permissibly compel an individual to speak, without regard for whether the speech is pure or symbolic. *See, e.g., Hurley v. Irish–Am. Gay, Lesbian, & Bisexual Grp. of Boston,* 515 U.S. 557, 568–70, 572–81, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (determining that the conduct of marching in a parade was sufficiently expressive to qualify as speech, before then applying the

2. I part ways with the majority's decision to focus solely on the graphic image of the kneeling Native American in determining the meaning third parties would draw from the license plate. The State of Oklahoma chose to deliver its governmental message through the use of words and the graphic. Although Mr. Cressman raises no objection to the slogan, "Native America," a fair understanding of the message communicated by the government and perceived by third parties can be gleaned only by considering the government's speech on its standard plate as a whole. *Cf. Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ("Our lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon.").

standard compelled speech analysis); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (determining that a mandatory flag salute is a form of speech, and then treating it no differently than a compelled oral pledge for purposes of First Amendment analysis). Nor has the Supreme Court recognized any lesser intrusion caused by compelled symbolic speech that would justify lesser restraint than on compelled pure speech. Indeed, the Supreme Court noted in *Wooley v. Maynard* that "the affirmative act of a flag salute," a form of symbolic speech, "involved a more serious infringement upon personal liberties than the passive act of carrying the state motto on a license plate," a form of pure speech. 430 U.S. 705, 715, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). Yet the Supreme Court has limited the state's power to compel a flag salute and to compel an individual to display a license plate bearing the words "Live Free or Die," using the same First Amendment restrictions.[3] *See, e.g., Wooley*, 430 U.S. at 715, 97 S.Ct. 1428; *Barnette*, 319 U.S. at 642, 63 S.Ct. 1178.

In sum, I would hold the Oklahoma standard license plate contains a slogan and graphic that together communicate a message from the Oklahoma government promoting the state's Native American heritage—government speech. To determine whether Mr. Cressman can be compelled to carry that message on his personal automobile, I would turn to standard principles governing the restrictions on compelled speech.

Typically, government speech is exempt from scrutiny under the First Amendment. *See Summum*, 555 U.S. at 467, 129 S.Ct. 1125. But in *Walker*, the Supreme Court reaffirmed its prior holding in *Wooley* that the free speech rights of private individuals are implicated by governmental messages contained on license plates. This is because the individuals are compelled to "use their private automobiles as a 'mobile billboard' for the State's ideological message." *Walker*, 135 S.Ct. at 2252–53 (quoting *Wooley*, 430 U.S. at 717 n. 15, 97 S.Ct. 1428). Accordingly, the Court cautioned in *Walker* that "we have recognized that the First Amendment stringently limits a

---

**3.** Although I agree with the majority's underlying premise that courts treat words differently from images or symbols, in my view, they do so only in the context of determining whether a particular incidence of expression *is* speech protected by the First Amendment. For example, the majority relies on *Texas v. Johnson*, 491 U.S. 397, 406, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), for the proposition that the Supreme Court "has recognized a clear distinction between symbolic speech and pure speech." Maj. Op. at 960. I agree that *Johnson* supports such a proposition, but *Johnson* does so in the very context of determining whether the act of burning a flag was sufficiently expressive to qualify as First–Amendment–protected expression. Once the Court determined the flag burning was expressive, it applied the "bedrock principle underlying the First Amendment" that "the government may not prohibit expression of an idea simply because society finds the idea itself offensive or disagreeable." *Johnson*,

491 U.S. at 406, 414, 109 S.Ct. 2533. That is, once the Court determined that the symbolic act of burning the flag was speech, it treated that act no differently from pure speech. As I see it, the first question is whether the case involves speech entitled to the protections afforded by the First Amendment. If it is speech, the next issue is the level of protection required.

Here, the Supreme Court has answered the first question by holding in *Walker*, that a state's approval of slogans and graphics for display on its license plates is speech. Thus, I would proceed directly to the second question and hold that an individual, like Mr. Cressman, cannot be compelled to deliver a message with which he disagrees. But Mr. Cressman's compelled speech challenge fails because he has expressly limited the basis of his disagreement to a message he has not shown the license plate was intended or understood to convey.

State's authority to compel a private party to express a view with which the private party disagrees." *Id.; see also Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005) (describing "true 'compelled-speech' cases" as those "in which an individual is obliged personally to express a message he disagrees with, imposed by the government"); *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 471, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997) (characterizing *Wooley* as a case in which private individuals were required "to use their own property to convey an antagonistic ideological message").

As the majority has explained in detail, Mr. Cressman does not disagree with the message Oklahoma intended to convey with its standard license plate. Maj. Op. at 963–64. And he has directed us to no evidence supporting his assertion that third parties would interpret the graphic as a message promoting pantheism, the message with which he disagrees. *See Cressman I*, 719 F.3d at 1154 (noting that "further factual development through discovery may or may not support [Mr. Cressman's] allegation" that viewers of the Oklahoma standard license plate would understand it "conveys a message that promotes pantheism, panentheism, polytheism, and/or animism"); *see also Troster v. Pa. State Dept. of Corr.*, 65 F.3d 1086 (3rd Cir.1995) (affirming the district court's denial of a preliminary injunction where the plaintiff presented no empirical evidence suggesting that third parties would consider a flag patch on a correctional officer's uniform as communicating a message).

Therefore, I join in the majority's conclusion that under the facts before us, Mr. Cressman's compelled speech claim fails. *See Glickman*, 521 U.S. at 471, 117 S.Ct. 2130 (rejecting fruit growers' compelled speech challenge to mandatory assessments to pay for generic advertising and stating, "With trivial exceptions on which the [district] court did not rely, none of the generic advertising conveys any message with which respondents disagree." (footnote omitted)).